Cite as 2020 Ark. App. 107

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CR–19–502

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered:** February 12, 2020 |
| KEVIN R. ADAMS | | APPEAL FROM THE BENTON |
| | APPELLANT | COUNTY CIRCUIT COURT |
| | | [NO. 04CR-18-1529] |
| V. | | |
| | | HONORABLE BRAD KARREN, |
| | | JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Kevin Adams appeals after he was convicted by a Benton County Circuit Court jury of three counts of violation of a protection order. He was sentenced to serve an aggregate of 120 days in the county jail and to pay a total of $4,500 in fines. On appeal, appellant contends that the circuit court erred in denying his motion for directed verdict when the State failed to provide sufficient evidence to show that he committed the counts of violation of a protection order. We affirm.

I. *Relevant Facts*

On October 17, 2017, the Benton County Circuit Court issued two orders of protection against appellant, prohibiting him from initiating any contact with his former spouse, Malinda Adams, and his minor children, Gr.A. and Ga.A. The order protecting the minor children was effective until June 11, 2019, and specifically

prohibited [appellant] from initiating any contact with the [children] including but not limited to physical presence, telephonic, electronic, oral, written, visual, or video. Respondent also shall not use a third party to contact the [children] except by legal counsel or as authorized by law or court order. . . . Visitation is established as follows: As set out in the orders entered in the parties' divorce case, 04DR-15-1617-5.

After the order was issued, and while it was still in effect, appellant "tagged" or linked Gr.A. and Ga.A. in several Facebook posts. Thereafter, appellant was arrested and charged with three counts of violation of a protection order in violation of Arkansas Code Annotated section 5-53-134 (Supp. 2019), a Class A misdemeanor. After appellant was found guilty by the Benton County District Court, he appealed to the circuit court. The circuit court thereafter held a jury trial on November 9, 2018.

At trial, Bailiff Ron Lance testified that he had personally served appellant with the October 17, 2017, orders of protection. Although he asked appellant to sign the orders, appellant refused to do so.

Ga.A. testified that appellant is her father and that she was a senior in high school at that time. She testified that she had a Facebook account for approximately six years and that appellant had tagged her in several of his posts after the orders of protection were issued. Ga.A. attempted to explain to the jury what tagging on Facebook means and the actions that are required in order to tag someone in a Facebook post. Ga.A. explained that Facebook gives a person an option to tag someone in a post. She further explained that when a person types another person's name, that person's Facebook profile picture would pop up if he or she is a Facebook friend. Once a person clicks on the other person's name after it pops up, it tags that person. Ga.A. opined that a person can easily identify when they tag someone because the name would appear underlined. Additionally, the name

2

would appear as bolded in the post as opposed to a name of someone who was not tagged. Facebook would then notify the other person that they had been tagged in a picture or post, and the post would also appear in the other person's Facebook feed. Ga.A. testified that Facebook notified her when appellant tagged her, and screenshots of those posts were admitted into evidence.

On February 4, 2018, appellant posted a status update on his Facebook profile and tagged or linked Ga.A. The tagged post stated the following:

> OH HOW I so DEARLY miss watching my DEAR [Ga.A.] play her sports events Due to the deceit of her Mother!

Shortly thereafter, appellant's adult daughter, Brittany Hudspeth, responded to appellant's post. Ms. Hudspeth stated, "That's your own damn fault!! Get over ittt!!!" Appellant then replied to Ms. Hudspeth's response and tagged both Ga.A. and Gr.A. He stated,

> NO ITS NOT, YOUR MOTHER IS A FALSE SPEAKER OF THE TRUTH!!! SHE BASES HER DECISIONS ON FEELINGS!! READ THE FACTS OF HER extending the protection because she feels threatened from pictures . . . HOW STUPID!!! She is the one keeping me from seeing my [Gr.A.] & [Ga.A.] All you know are the lies you have been told.

Three days later, on February 7, 2018, appellant posted a video on his Facebook page titled "Parental Alienation," and he again tagged Gr.A. and Ga.A. among others.

> WOW!!! THIS VERY THING HAPPENED TO ME, [Ga.A.], & [Gr.A.], ETHAN ADAMS, AMBER ALLISON, BRITTANY HUDSPETH. ARE ALL LISTING TO erroneous speech!!

Finally, on March 18, 2018, appellant tagged Gr.A. and Ga.A. in another status-update post on his Facebook profile in which he stated the following:

> I SO LOVE MY [Gr.A.] & [Ga.A.] So MUCH I HURT NOT BEING ABLE TO HUG THEM & LOVE THEM PHYSICALLY!!!

3

Ga.A. testified that after she received the Facebook notifications that she had been tagged in several posts by appellant, she showed the posts to her mother, Malinda Adams. In each of the instances described above, Ga.A. was able to read the message posted by appellant.

Gr.A. echoed his sister's testimony. Gr.A. testified that his understanding of the protection order was that appellant could not have any communication with him, including over any electronic media such as Facebook. Although Gr.A. admitted that he did not check his Facebook account as much as his sister, he received notifications of the Facebook posts in which he was tagged. Gr.A. testified that he did not respond to any of the posts but showed the posts to his mother. In each of the instances described above, Gr.A. was able to read the message posted by appellant.

Malinda Adams testified that she had been married to appellant and that she and appellant had been separated since October 2015. She later obtained a divorce. Ms. Adams explained that appellant was very familiar with computers, software, and programming. During their marriage, appellant owned a computer repair business and used his Facebook account.

Detective Michael Lisenbee testified that he serves in the roles of both a sergeant and detective at the Pea Ridge Police Department. In his roles, he maintains the department's Facebook page and has received specialized training on social media issues for law enforcement. At trial, Detective Lisenbee testified regarding the mechanics and terminology of "friending," "tagging," and "notifications" as they pertain to Facebook. Detective Lisenbee explained that

> [t]o understand the premise of tagging someone in a Facebook account, there has to be a foundation established on what exactly is being tagged or who is being tagged

on Facebook and that foundation to be established is that certain people or certain organizations or entities will actually create a Facebook page that is self identifying to them, whether that be a personal page, a page that belongs to a church, a police department if you will, things of that nature. And then once that – once the creation of that entity has been established on Facebook, then that's when the networking comes in play because then you will have essentially somebody will have an account – one account here and then another account here and then as everyone kind of knows Facebook has got millions of accounts I'm assuming.

When you have the accounts, how they are networked is people that manage their Facebook accounts have the ability to share their experiences of what they do in their day-to-day lives on their Facebook page. And so with that not only can they post on the Internet texts, videos, photographs, various plethora of media that can be put out on the Facebook, they can also share that content with people that they have linked through permission on their Facebook accounts to the content that they're posting. . . . that linking by permission . . . [is] what we sometimes call "friending[.]" . . . Say you have an account and you wish for the content of your account to be viewable within certain parameters with another account you friend their account and then once that friendship has been accepted then anything that you write on your page or anything someone else was to write on their page would be completely viewable by both parties. . . .

 [Alerts to what I have done] comes into play with the mechanism in Facebook called "notifications." There are certain parameters that can be edited and altered in the notification settings of a Facebook account, but typically how the default setting is if you have a Facebook account and someone links a post or a video or a text of any kind to your specific Facebook account you are not – your account notifies you that said person has told you – has linked something on their Facebook to your Facebook.

. . . .

So first what needs to be established is in order for say if I was to use a Facebook account and I wanted to tag somebody in a post that I wanted to put up, I would need to be friends with them, for one. And, two, once that friendship is established there are a number of ways that somebody can be tagged into a post. So one example could be when you're writing the text of whatever you're posting on Facebook if you wish for somebody to be included in that text and essentially tagging them you would type their name. . . . The Facebook operating system, the app if you will, recognizes that you are typing a specific person as opposed to just typing regular text and it will give you the option to either continue with that person, to tag them in that post, or remove that option to where you're not including them in that post. And that notification is very apparent. It's very visible and it is visibly different than writing average text as opposed to specifically linking a person in what you type.

5

Detective Lisenbee testified that he was familiar with appellant and that he had been involved in previous investigations involving appellant for alleged violations of a protection order. Those previous investigations specifically involved appellant communicating through Facebook posts and text messages. Based on all of his knowledge and expertise, Detective Lisenbee opined that appellant's actions were an intentional form of communication to Gr.A. and Ga.A. and not simply an accident or mistake.

On cross-examination, Detective Lisenbee was asked what would happen if one started typing the name of someone who was one's friend on Facebook. Detective Lisenbee responded,

> If there is a friend in my inventory of Facebook that I am friends with and his name is Kevin and say I have two or three Kevins on there, it will show every Kevin that's linked as a friend to my Facebook page and give me the option to choose which Kevin I went fishing with. Therefore, you have to stop and either click one of the proverbial Kevins that's going to be shopping with you or, I mean, fishing with you or you have to actually manipulate the text to where it doesn't automatically pick one of the three and you have to continue to type on. But it will specifically stop the text to reference which one you are wishing to tag in the post.

After the State rested, appellant moved for a directed verdict. Appellant argued that the State failed to prove that he knowingly violated the order of protection. He more specifically argued that the State failed to show that appellant knew that he was tagging the children or that the children would receive any sort of notification. Appellant additionally argued that there "may be an issue with in-court identification." The circuit court denied appellant's motion.

Appellant testified on his own behalf and admitted that he posted the posts at issue on his Facebook profile. He explained that his purpose was to show his Facebook friends

6

what was going on in his life and that he used his children's first and last names in the posts to avoid any confusion over whether Ga.A. or Gr.A. are his biological children or stepchildren. Appellant further claimed that he did not know who his Facebook friends were at the time or that Ga.A. or Gr.A. were still his Facebook friends. Moreover, he stated that he did not know that Ga.A. or Gr.A. saw any of those posts and denied knowing that they would receive any notifications for mentioning them in his posts. Although he admitted that he could have "accidentally tagged" them in the posts, he denied doing so intentionally.

On cross-examination, appellant admitted that he had been a Facebook user since before his separation. In fact, he admitted that he previously had created a "secret Facebook account." Appellant denied receiving the orders of protection in contradiction to Bailiff Lance's testimony but admitted that he remembered the circuit court orally instructing him that he was not allowed to have any contact through any third party.

At the close of all the evidence, appellant renewed his motion for a directed verdict for the same reasons as he stated at the close of the State's evidence. The circuit court denied his motion. The jury found appellant guilty of all three counts. He was sentenced to serve forty days in the county jail on each count to be served consecutively for a total of 120 days in the county jail and ordered to pay a $1,500 fine on each count. This appeal followed.

## II. *Sufficiency of the Evidence*

A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Hinton v. State*, 2015 Ark. 479, 477 S.W.3d 517. When reviewing a challenge to the

7

sufficiency of the evidence, this court assesses the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Id.* The sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Wyles v. State*, 368 Ark. 646, 249 S.W.3d 782 (2007); *Brawner v. State*, 2013 Ark. App. 413, 428 S.W.3d 600. Substantial evidence is evidence that is of sufficient force and character that will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Hinton*, *supra.* Finally, the credibility of witnesses is an issue for the jury and not the court. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

Arkansas Code Annotated section 5-53-134 provides the following in relevant part:

(a)(1) A person commits the offense of violation of an order of protection if:

(A) A circuit court or other court with competent jurisdiction has issued a temporary order of protection or an order of protection against the person pursuant to the Domestic Abuse Act of 1991, § 9-15-101 et seq.;

(B) The person has received actual notice or notice pursuant to the Arkansas Rules of Civil Procedure of a temporary order of protection or an order of protection pursuant to the Domestic Abuse Act of 1991, § 9-15-101 et seq.; and

(C) The person knowingly violates a condition of an order of protection issued pursuant to the Domestic Abuse Act of 1991, § 9-15-101 et seq.

Arkansas Code Annotated section 5-2-202(2) (Repl. 2013) states,

A person acts knowingly with respect to:

(A) The person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist; or

(B) A result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result[.]

This court has noted that a criminal defendant's intent or state of mind is seldom apparent. *Rose v. State*, 2018 Ark. App. 446, 558 S.W.3d 415. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw on common knowledge and experience to infer it from the circumstances. *Id.* Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.*

On appeal, appellant argues that the State failed to provide sufficient evidence to show that he knowingly committed the counts of violation of a protection order. He contends that "he did not know the posting he placed on his Facebook page constituted 'contact' with his children when each child was mentioned because [he] did not understand the consequences of what it meant to have someone named—and therefore tagged—on Facebook." Appellant acknowledges Ga.A.'s testimony that in order to tag her and her brother, appellant would have had to type their names, wait for their pictures to pop up, and then click on their names thereby tagging them. However, appellant specifically quotes the following small excerpt of Detective Lisenbee's testimony on cross-examination. Appellant states that Detective "Lisenbee went on to state that a person will 'have to actually manipulate the text to where [Facebook] doesn't automatically' pick a friended account to tag in the place of the typed name." However, appellant ignores Detective Lisenbee's earlier testimony that "it will give you the option to either continue with that person, to tag them

9

in that post, or remove that option to where you're not including them in that post. And that notification is very apparent." Instead, focusing only on the selected excerpt, appellant alleges that because the evidence was "so evenly weighed," the jury had to resort to speculation and conjecture that Facebook "didn't simply automatically tag Ga.A. and Gr.A.'s Facebook accounts when their names were typed in [his] posts." We disagree.

Here, the jury was not required to believe appellant's self-serving testimony that he did not know he was tagging his children in his posts or that Facebook would notify his children. The fact-finder is not required to believe any witness's testimony, especially the testimony of the accused, because the accused is the person most interested in the outcome of the trial. *Rose*, *supra*. It is within the province of the jury to determine the credibility of witnesses and resolve any questions of conflicting testimony and inconsistent evidence. *Hinton*, *supra*; *Brawner*, *supra*. The evidence at trial showed that appellant was an experienced Facebook user. Ga.A. testified that appellant had to take affirmative steps in order to tag her and her brother in appellant's posts. Moreover, both Ga.A. and Detective Lisenbee testified that it would be visibly apparent that appellant was tagging his children in the posts at issue. Detective Lisenbee further opined that appellant's actions were an intentional form of communication and not simply an accident or a mistake. As such, a jury could conclude from these facts that appellant knowingly violated the order of protection, and we must affirm on this point.

Appellant lastly argues that the jury was forced to resort to speculation and conjecture to find that Facebook posts were barred by the order of protection because the order of protection allowed visitation with the children "as set out in the orders entered in the parties'

10

divorce case," which were not introduced at trial. However, appellant did not make this argument in his directed-verdict motion. An appellant may not expand or enlarge the grounds for a directed-verdict motion when arguing the issue on appeal. *Savage v. State*, 2017 Ark. App. 261, 520 S.W.3d 706. Instead, he is bound by the scope of the directed-verdict motion made at trial, and all other arguments are not preserved for appellate review. *Id.* Because this claim was not a basis for his motion at trial, it was not preserved for appeal and is barred from review by this court. *Marshall v. State*, 2017 Ark. 347, 532 S.W.3d 563. Thus, we affirm.

Affirmed.

KLAPPENBACH and VAUGHT, JJ., agree.

*Hancock Law Firm*, by: *Alex R. Burgos*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.