*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ARM,

      Petitioner,

and

PEOPLE OF THE STATE OF MICHIGAN,

      Appellee,

v

KJL,

      Respondent-Appellant.

FOR PUBLICATION
July 14, 2022
9:15 a.m.

No. 357120
St. Clair Circuit Court
Family Division
LC No. 16-000741-PP

ARM,

      Petitioner-Appellee,

v

KJL,

      Respondent-Appellant.

No. 358858
St. Clair Circuit Court
Family Division
LC No. 20-001291-PP

ARM,

      Petitioner-Appellee,

v

KJL,

      Respondent-Appellant.

No. 358859
St. Clair Circuit Court
Family Division
LC No. 16-000741-PP

-1-

Before: CAMERON, P.J., and O'BRIEN and SWARTZLE, JJ.

SWARTZLE, J.

ARM sought and received several domestic personal protection orders (PPO) against KJL. This appeal centers on one PPO issued by the trial court in 2016. We conclude that KJL's conviction for criminal contempt survives his various challenges on appeal, and we further conclude that KJL's claim that his separate sentences were de facto consecutive sentences is moot. While we also find that his claim involving good-time credit is likewise moot, we choose to address it because it has public significance and would likely evade appellate review in future cases. On this latter claim, we agree with KJL that the local sheriff's policy of categorically prohibiting certain offenders from earning good-time credit—i.e., those incarcerated for contempt of court— runs directly contrary to the statute enacted by our Legislature. Accordingly, for the reasons more fully explained below, we affirm in part and reverse in part.

## I. BACKGROUND

There is a lengthy history between ARM and KJL. The two share a child, and there was an acrimonious custody battle over the child. Based on allegations of mental and physical domestic violence, ARM obtained and received a PPO against KJL in 2015. The trial court held an evidentiary hearing and found that the PPO had been properly granted and that KJL had violated it; KJL violated the PPO again later that year. The PPO eventually lapsed by its own terms in March 2016.

Immediately thereafter, ARM sought another PPO against KJL, the one at issue in this appeal. ARM made various allegations against KJL, including repeated unwanted contacts with her and her friends and family on social media. The trial court entered the order on March 31, 2016, without a hearing. In addition to other prohibitions not relevant to this appeal, the PPO barred KJL from stalking petitioner, as defined under MCL 750.411h and 750.411i. (The order was subsequently amended to permit contact between the parties at parenting-time exchanges.) KJL moved to terminate the PPO in April 2016, and, after several proceedings, the trial court denied the motion in March 2018. KJL did not argue at that time that the PPO violated his right to free speech, nor did he appeal the trial court's order.

In March 2019, ARM filed a show-cause motion with respect to the present PPO, alleging that KJL used a Facebook profile with the name of his deceased father, "KW", to speak directly to ARM, speak about her with others, tag her in comments, share photographs and posts from her old Facebook account, and post an order from their custody case that included her address. She argued that this conduct violated the PPO.

The trial court held an evidentiary hearing on the matter. During the hearing, ARM offered "Exhibit A" as proof that KJL violated the PPO. Exhibit A consisted of twelve pages of screenshots ARM took on her phone of a Facebook page KJL created called "Justice for O." (O is the child of ARM and KJL.) In the screenshots, "KW" alleged that ARM associated with a sex offender and allowed the offender to interact with O. "KW" also posted screenshots of ARM's old Facebook posts on past Father's Days that expressed love and affection for KJL. Then, on

-2-

page seven of the exhibit, "KW" appeared to tag ARM in a comment, which directly alerted ARM about the post.

When the prosecutor offered to admit Exhibit A into evidence, KJL's attorney asked if the prosecutor was moving to admit "pages one to 12." The prosecutor answered "yes," to which KJL's attorney responded, "I have no objection to that."

ARM testified that she believed KJL wrote the posts purportedly by "KW" because she recognized KJL's writing style and how he used social media. The prosecutor objected on cross examination to questions about page three of the exhibit, prompting the trial court to question whether the post on page three was "one of the things that [ARM]'s asserting as a violation of the PPO." The prosecutor responded that only the posts on pages 8 through 12 were alleged to be direct violations of the order. In light of this explanation, KJL's attorney moved to strike pages one through seven from the record. The prosecutor opposed the motion, reasoning that the earlier pages provided context for the subsequent pages. The trial court agreed with the prosecutor, stating that pages one through seven "may support an interpretation of eight through 12, and it's already part of the record so I'm not going to strike it." KJL's attorney then proceeded to question ARM in detail about the entirety of Exhibit A, including the first seven pages.

After ARM's testimony concluded, the trial court admitted into evidence phone calls KJL made in jail after ARM's show-cause motion was filed. During the calls, KJL discussed with his sister, MC, and at least one other person, various Facebook posts that they should make on the "Justice for O" page. During one of the calls, KJL gave specific instructions about what he wanted posted on the "Justice for O" profile (the "Justice for O" page and profile are two separate Facebook accounts), detailing the post's precise words and even spacing. In a subsequent call, KJL directed a person to "make sure that you're posting in ['KW'] too. . . . Because . . . that's just going to negate their whole argument that it's me doing it, you know what I mean?" During that same call, KJL gave specific instructions for a post on the "Justice for O" page that included pictures of ARM. MC testified and claimed that she was solely responsible for the "KW" Facebook posts. MC admitted that she discussed the Facebook posts with KJL, but claimed that she never posted a message that KJL requested word-for-word.

KJL's attorney moved to dismiss at the conclusion of the hearing. As part of her response, the prosecutor clarified, "[A]t first the focus really was on pages eight through 12 [of Exhibit A], but through Defense Counsel's questioning he enlightened me that in fact there is a lot more violations than just those in the end of the document." The prosecutor then argued, in relevant part, that the information on page seven of the exhibit further established that KJL violated the PPO. KJL's attorney did not object or otherwise suggest that the trial court could not consider pages one to seven of Exhibit A. The trial court denied KJL's motion to dismiss and took the matter under advisement.

The trial court issued a written opinion and order. Relevant to this appeal, the trial court found as a factual matter that KJL was responsible for the Facebook posts from the "KW" profile, because he either directly posted the comments or indirectly posted them in coordination with others. The trial court took note of the "ease" by which KJL spoke with people about making Facebook posts, and from this the court drew the conclusion that such conversations were a regular occurrence. Even so, the trial court concluded that most of the complained-of Facebook posts

were constitutionally protected speech. It was only with respect to a single post that KJL stepped over the line: "All while the mother [referring to ARM] who has never made an issue out of his [referring to KJL] charges. The drug charge was a medical marijuana charge that he took so that the mother didn't get in trouble. Ask **[ARM]**." The post tagged ARM, meaning that her name was spelled out and bold faced. With respect to this post, the trial court explained,

> However, Exhibit A, p. 7, is also the only post which was a direct communication to [ARM]. [ARM] testified that she was "tagged" in the post, which means that, when her contact information was typed into the post, she received a notification that the post had been made. [ARM], by obtaining the PPO, had made it clear to [KJL] that she did not want communications from him. *See Peterson* [*v Peterson*, unpublished opinion per curiam of the Court of Appeals, issued June 17, 2008 (Docket No. 283188), p 5]. "Tagging" [ARM] in the post violated [ARM's] constitutional "right to be left alone," and is not constitutionally protected speech. *PLT* [*v JBP*, unpublished opinion per curiam of the Court of Appeals, issued Dec. 26, 2019 (Docket No. 346948), p. 4]. Because the speech is not constitutionally protected, it is a violation of the PPO. [Opinion and Order Regarding Order to Show Cause of March 6, 2019, Against Respondent, issued June 16, 2020 (Docket No. T 2016-0741), p 18.]

The trial court had earlier concluded that KJL's conduct, including the offending tagged comment, would cause a reasonable person to feel harassed or molested and did, in fact, cause ARM to feel this way as well as emotionally distressed. Moreover, the trial court observed that the conduct was part of an "ongoing course of conduct" by KJL spanning several years, i.e., this was not a limited, one-off contact with ARM. Accordingly, the trial court found KJL guilty of violating the 2016 PPO for the tagged comment. KJL's appeal in Docket No. 357120 relates to this opinion and order.

With respect to the other two appeals (Docket Nos. 358858 and 358859), ARM obtained another PPO against KJL in August 2020, and the trial court sentenced KJL on several separate occasions for criminal contempt. The sentencing orders from June 22, 2021 and July 29, 2021, are at issue on appeal. The March 30, 2021, order sentenced KJL to incarceration for 90 days; the June 22, 2021, and July 29, 2021, orders sentenced him to incarceration for 93 days. All three orders stated that KJL was not entitled to any good-time credit.

KJL challenged his sentences below, arguing that he was entitled to good-time credit. The trial court rejected the challenges. As the trial court noted, "The St. Clair County Sheriff has a long-standing policy, which has been implemented with the consent of various chief judges of the 31st Circuit Court, that prisoners serving sentences for contempt of court are not entitled to earn good time under MCL 51.282 *et. seq.*" The trial court explained that its sentencing orders foreclosing good-time credit simply recognized this policy.

These appeals followed and were consolidated by this Court. *ARM v KJL*, unpublished order of the Court of Appeals, entered March 8, 2022 (Docket Nos. 357120, 358270, 358858, and 358859). (The fourth appeal identified in the consolidation order, Docket No. 358270, related to the same order appealed in Docket No. 358858. It has since been dismissed on KJL's motion to withdraw the appeal. *ARM v KJL*, unpublished order of the Court of Appeals, entered February

22, 2022 (Docket No. 358270).) KJL filed a brief for each appeal; ARM and the prosecutor chose not to file a brief or otherwise participate in these appeals.

## II. ANALYSIS

### A. STANDARD OF REVIEW

A person who fails to comply with a domestic PPO issued under MCL 600.2950 is subject to the criminal-contempt powers of the trial court. MCL 600.2950(23). As the petitioner, ARM had the burden of proving beyond a reasonable doubt that KJL violated the PPO. *In re JCB*, 336 Mich App 736, 747; 971 NW2d 705 (2021).

On appeal, this Court reviews a trial court's decision to hold a party in contempt for an abuse of discretion. *Id.* An abuse of discretion occurs when "the trial court's decision is outside the range of principled outcomes." *Porter v Porter*, 285 Mich App 450, 455; 776 NW2d 377 (2009). As part of our review, we look only for clear error with respect to the trial court's factual findings, *In re JCB*, 336 Mich App at 748, though we give no deference to a trial court's constitutional or statutory interpretation and review those matters de novo, *TM v MZ (On Remand)*, 326 Mich App 227, 236; 926 NW2d 900 (2018).

### B. NO CONCESSION OR STIPULATION

KJL first argues that the trial court abused its discretion by holding that he violated the 2016 PPO. In KJL's view, the prosecutor had waived any claim of violation based on information found in pages one to seven of Exhibit A, which included the sole offending Facebook post. As a result of the waiver, the trial court should not have considered the tagged material on page seven.

When the entire transcript is considered, it is clear that there was, in fact, no waiver by the prosecutor. The prosecutor had argued that KJL violated the PPO through "KW's" Facebook posts, as demonstrated by Exhibit A. When Exhibit A was offered into evidence, KJL's attorney specifically stated that he had "no objection" to admitting "pages one through 12." By affirmatively consenting to Exhibit A's admission into evidence, KJL waived any objection to the trial court's reliance on that evidence. See *Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014).

Although the prosecutor did state, early in the hearing, that only pages eight to 12 were being offered to show that KJL violated the PPO, there was no explicit stipulation in the record that the trial court should consider only pages eight to 12. In fact, the trial court specifically declined to strike pages one to seven because the entire exhibit had already been admitted into evidence. KJL's attorney evidently took this ruling to mean that pages one to seven would still be considered by the trial court, as counsel went on to cross examine ARM extensively about those pages. This questioning prompted the prosecutor to walk back her earlier representation about pages one to seven; the prosecutor then explicitly cited the material on page seven as violating the PPO, to which KJL's attorney did not object. Given this, the record does not support KJL's argument that there was a stipulation for the trial court to consider only pages eight to 12 of Exhibit A. Instead, KJL tried and failed to strike pages one to seven from Exhibit A, and, when that attempt failed, those pages were treated the same as eight to 12 for the remainder of the hearing. Thus, the trial court did not err by considering the information found on page seven of Exhibit A.

## C. SUFFICIENCY OF THE EVIDENCE

KJL next argues that the trial court abused its discretion because there was insufficient evidence that KJL authored the Facebook posts. As a general matter, identity is an element in every offense. *People v Galloway*, 335 Mich App 629, 641; 967 NW2d 908 (2021). "When examining the sufficiency of the evidence to support a criminal-contempt finding following a bench trial, this Court views the evidence presented in a light most favorable to the prosecution to determine if the elements of the crime were proven beyond a reasonable doubt." *In re JCB*, 336 Mich App at 747. We do not reweigh the evidence or reassess witness credibility. *Id.* at 748. "Circumstantial evidence and the reasonable inferences arising from that evidence can constitute satisfactory proof of the elements." *Id.*

Critical to the trial court's contempt conviction was the fact that ARM was directly tagged in the Facebook comment on page seven of Exhibit A. By tagging ARM, the author of the comment ensured that ARM would be sent a notification about the comment. Thus, the Facebook tag was a means of contacting ARM. This Court and others have found that such tags, posts, and similar means of electronic communication (e.g., email, text) are "contacts" between the sender and recipient. See *Adams v State*, 594 SW3d 884, 891 (Ark App, 2020); *Buchanan v Crisler*, 323 Mich App 163, 902-903; 922 NW2d 886 (2018); cf *Majumdar v Fair*, 567 F Supp 3d 901, 911 (ED Ill, 2021) (concluding that a Facebook tag is an "intentional, direct contact" with the tagged entity for the purpose of personal jurisdiction).

As for who tagged ARM, MC testified that she made the "KW" profile, controlled it, and posted from it. The prosecutor did not offer any direct evidence that KJL was the author of the "KW" comments, but ARM did testify that, based on her long history with KJL, she was confident the posts originated from him, as the posts were consistent with his style and the content of his past social-media use. Indeed, although MC claimed that she never posted a message that KJL requested word-for-word, there was substantial circumstantial evidence that suggested otherwise.

As the trial court observed, KJL's recorded phone calls showed that he directed other people to post on the "Justice for O" page. These directions included specific language, spacing, and the account from which certain posts should come. During one of the calls, KJL specifically directed that the other person post as "KW" to make it appear that he was not "KW" given that he was in jail at the time. Although the phone calls occurred after ARM moved to show cause, the calls provide relevant, circumstantial evidence that KJL had a "scheme, plan, or system" of directing the messages to be posted via the "KW" and "Justice for O" Facebook sites. MRE 404(b)(1). As the trial court also observed, the ease of the conversations suggested that this sort of coordination was common practice. Based on our review of the record, we conclude that there was sufficient evidence supporting the trial court's factual finding that KJL was responsible for making the offending post.

## D. FREEDOM OF SPEECH

KJL also presents a constitutional challenge to his contempt conviction, specifically that the 2016 PPO violated his constitutional right to free speech. A person has the right to freedom of speech under both the federal and state Constitutions, US Const, Am I; 1963 Const, art 1, § 5, and the domestic PPO statutory scheme specifically exempts from its reach the protected speech of

those covered by an order, MCL 600.2950(1)(j); MCL 750.411h(1)(c). Recognizing this, we nonetheless conclude that KJL's challenge is without merit.

First, the time for directly attacking the 2016 PPO has passed. KJL first moved to terminate the PPO in April 2016, but he did not raise a constitutional challenge. The trial court denied KJL's motion in March 2018, and KJL had 21 days to appeal as of right that decision. MCR 3.709(B); MCR 7.204(A)(1) (21-day period applies to an appeal from the denial of a motion to terminate a PPO, while 42-day limit applies to an appeal of criminal contempt conviction and sentence under a PPO, MCR 7.204(A)(2)); see also *In re JCB*, 336 Mich App at 746. He did not appeal the denial of his motion to terminate. His current claim of appeal in Docket No. 357120, filed in May 2021, is based on a more recent violation of the 2016 PPO.

"It is well established in Michigan that, assuming competent jurisdiction, a party cannot use a second proceeding to attack a tribunal's decision in a previous proceeding." *Workers' Compensation Agency Dir v MacDonald's Indus Prod, Inc*, 305 Mich App 460, 474; 853 NW2d 467 (2014); see also *Domestic Abuse and Violence: Defenses; collateral attack on validity of order*, 25 Am Jur 2d § 49 (2014). KJL's current appeal involving the trial court's conviction and sentence of him under the 2016 PPO is "a second proceeding" with respect to the trial court's earlier denial of his motion to terminate that PPO. Thus, KJL's claim in this appeal is a collateral attack on the 2016 PPO, and for this reason alone, the claim fails. *In re JCB*, 336 Mich App at 746-747.

Second, KJL's attempt to skirt the collateral-attack rule is without merit. KJL concedes that his constitutional claim is a collateral attack on the 2016 PPO, but he tries to bypass the bar by relying on the so-called "transparently invalid" exception recognized by the U.S. Court of Appeals for the First Circuit in *In re Providence Journal Co*, 820 F2d 1342, 1344 (CA 1, 1986) (*Providence I*). This Court, of course, is not bound by the decision of federal courts other than the U.S. Supreme Court. *Bienenstock & Assoc, Inc v Lowry*, 314 Mich App 508, 515; 887 NW2d 237 (2016). No Michigan appellate court has cited or accepted the exception to the collateral-attack rule announced in *Providence I*, and we decline to do so. More importantly, the original opinion in *Providence I* was modified on rehearing to require the enjoined party to make a good-faith effort to seek emergency appellate relief before opting to disregard the offending order on its own initiative. *In re Providence Journal Co (On Rehearing)*, 820 F2d 1354, 1355 (CA 1, 1987) (*Providence II*). KJL does not acknowledge this modification of the rule announced in *Providence II* or suggest that he sought and was unable to secure timely appellate relief. Accordingly, even on its own terms, *Providence I* does not support KJL's position on appeal.

And third, even if we were to reach the merits, the 2016 PPO was not transparently invalid. The order prohibited KJL from, among other things, stalking ARM as defined by MCL 750.411h and MCL 750.411i. The statute specifically exempts "constitutionally protected activity" from the scope of harassment that can constitute stalking. MCL 750.411h(1)(c). There is no language in the order that could, on its face, be construed as a prior restraint.

To the extent KJL also challenges on First-Amendment grounds the trial court's conclusion that KJL violated the PPO, we find his position similarly unpersuasive. Stalking refers, in part, to "a willful course of conduct involving repeated or continuing harassment," MCL 750.411h(1)(d), but "[h]arassment does not include constitutionally protected activity," MCL 750.411h(1)(c).

While a person subject to a PPO does not give up the constitutional right to free speech merely by being subject to an order, "the right to speak freely is not absolute." *TM (On Remand)*, 326 Mich App at 237 (internal quotation marks and citation omitted).

Relevant here, a person's right to free speech must be understood in light of another person's interest in being left alone. As the US Supreme Court explained,

> The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader "right to be left alone" that one of our wisest Justices characterized as "the most comprehensive of rights and the right most valued by civilized men." *Olmstead v United States*, 277 US 438, 478; 48 S Ct 564; 72 L Ed 944 (1928) (BRANDEIS, J., dissenting). . . . None of our decisions has minimized the enduring importance of a right to be free from persistent importunity, following and dogging after an offer to communicate has been declined. While the freedom to communicate is substantial, the right of every person to be let alone must be placed in the scales with the right of others to communicate. [*Hill v Colorado*, 530 US 703, 716-718; 120 S Ct 2480; 147 L Ed 2d 597 (2000) (cleaned up).]

Our review confirms that the trial court engaged in a careful, thoughtful analysis on this matter. The trial court agreed in large part with KJL and concluded that most of the posts reflected protected speech. It did, however, conclude that the post on page seven of Exhibit A was not protected speech because the post involved direct contact with ARM. That is, by tagging ARM, thereby ensuring that she would receive notification of the post, KJL effectively contacted ARM and violated ARM's right to be left alone, as embodied by the PPO. The violation of the PPO did not result from the content of the post—rather, the violation resulted from the tagged contact. Thus, had KJL made the post about ARM without applying a tag, the post likely would have been protected speech. And, while the contact, viewed in isolation, was not particularly alarming, this was not an isolated contact, as the trial court aptly observed, but instead was part of a lengthy series of unlawful conduct and contact by KJL that caused ongoing harm to ARM and others. Accordingly, because the trial court found KJL in contempt for electronically *contacting* ARM, rather than for the *content of the speech* he used to do so, the contempt finding did not violate KJL's right to freedom of speech. See *Giboney v Empire Storage & Ice Co*, 336 US 490, 502; 69 S Ct 684; 93 L Ed 834 (1949) (explaining that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed").

### E. GOOD-TIME CREDIT

Turning next to his sentencing challenges, KJL argues that the trial court reversibly erred with regard to good-time credit under MCL 51.282. There is, however, little question that the matter is now moot. The last sentencing order appealed in these consolidated appeals is the trial court's July 29, 2021 order imposing a jail term of 93 days. Because that sentence expired on October 30, 2021, we can no longer grant relief from the sentence imposed. "The courts will generally refrain from deciding issues that are moot, meaning it is impossible for the court to craft an order with any practical effect on the issue." *Moore v Genesee Co*, ___ Mich App ___, ___;

\_\_\_ NW2d \_\_\_ (2021) (Docket No. 355291); slip op at 2.  Nonetheless, we will address the issue because it is of public significance and likely to recur yet evade appellate review.  See *id*.

The applicable good-time credit provision provides:

> (1) The sheriff shall cause to be kept a record of each and all infractions of the rules and regulations by prisoners, with the names of the persons so offending and the date and character of each offense, and shall examine such records as often as may be necessary to carry out the purpose and intent of this act.

> (2) Every prisoner whose record shows that there are no violations of the rules and regulations shall be entitled to a reduction from his or her sentence as follows: 1 day for each 6 days of the sentence.  The sheriff may, by general rule, subject to amendment from time to time, prescribe how much of the good time earned under this subsection a prisoner shall forfeit for any infraction of the general rules and regulations, and for any act of insubordination the sheriff may by special order take away any portion of or the whole of the good time made by any prisoner up to the date of such offense.  The sheriff may as a reward for especially good conduct, in case of insubordination, restore to any prisoner the whole or any portion of the good time lost because of any minor infraction of the rules.  [MCL 51.282.]

As this Court has previously observed, the foregoing language is not ambiguous.  *People v Cannon*, 206 Mich App 653, 655; 522 NW2d 716 (1994).  "In clear and unmistakable terms, the Legislature has stated that every county prisoner *shall* be entitled to a reduction of sentence of one day for every six days served where there are no violations of the rules and regulations."  *Id*. at 656.  While a sheriff has discretion to set a rule on how much good-time credit is forfeited for an infraction of the jail's "rules and regulations," MCL 51.282(2), there is nothing in the statute to suggest that the sheriff has similar discretion to set a rule on whether a prisoner is eligible to earn such credit in the first instance.  Likewise, a sentencing court is not permitted to circumvent or nullify the statutory scheme by "taking away good-time credits in advance."  *Cannon*, 206 Mich App at 655.  Stated differently, "a court may not deprive a prisoner of good-time credit to which the prisoner may be entitled under statute before that prisoner has even begun serving the term of imprisonment."  *Id*.

And yet, this is precisely what the trial court did here, contrary to the clear holding in *Cannon* and the unambiguous language of MCL 51.282(2).  The trial court grounded its holding on the local sheriff's "long-standing policy."  But a local sheriff's policy cannot trump the Legislature's duly enacted statute, regardless of any consent by the circuit court's chief judges.  By ordering in advance that KJL was categorically prohibited from earning good-time credit, the trial court violated MCL 51.282(2).

## F.  CONSECUTIVE SENTENCING

Finally, KJL argues that the trial court imposed de facto consecutive sentences by strategically timing the sentences to run one after the other, and that this violated KJL's rights to due process, equal protection, and a speedy trial.  We decline to address these arguments because they have been rendered moot by the expiration of the sentence imposed by the July 29, 2021 order

and involve unusual factual and procedural circumstances that are unlikely to recur yet evade judicial review.

## III. CONCLUSION

We remand in Docket Nos. 358858 and 358859 for correction of the June 22, 2021 and July 29, 2021 sentencing orders to omit the provision precluding good-time credit. In all other respects, we affirm. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Colleen A. O'Brien
/s/ Thomas C. Cameron